# Gray v. Leer

*Larry W. Wolf,* for plaintiffs.

*Gary E. Hartman,* for defendants Daniel and Jacqueline Leer.

*Karen N. Connelly,* for defendant June J. Shook.

KUHN, *J.,* October 26, 1995—To fully understand this matter, the court will discuss the procedural and then the factual background.[1] Whenever possible, a chronological history will be presented.

On March 15, 1995, plaintiffs, C. Adair Gray and Debra G. Gray, filed a complaint in equity against defendants, Daniel C. Leer and Jacqueline K. Leer and June J. Shook. Mrs. Gray and Mrs. Leer are sisters. Mrs. Shook is Mr. Leer's mother. Plaintiffs allege that the Leers fraudulently conveyed a farm located in Huntington and Latimore Townships, Adams County, Pennsylvania to Mrs. Shook contrary to the terms of an arbitration award entered in North Carolina. Plaintiffs seek to have the conveyance set aside and the real estate sold pursuant to the arbitration award.

The subject farm which Mrs. Shook and her late husband bought in 1951 had been in the Leer family since the 1830s. On February 26, 1976, Mrs. Shook (then June J. Leer) sold the farm to Mr. and Mrs. Leer (deed book 323, page 102) for $70,000 and took back a bond (PX 1) and mortgage (PX 2—mortgage book 65, page 195) in the amount of $60,000. Over the years from 1976-1995, the Leers executed eight mortgages against the farm in favor of Farmers Home Admini-

---

1. The briefs filed in this matter include many factual averments which are not part of the record and will be ignored.

stration in face amounts of $184,600. The Leers apparently had financial difficulties and were unable to pay Mrs. Shook's mortgage.

In 1993, the Grays and the Leers intended to enter into a partnership whereby the Grays would sell their farm in New York, the Leers would sell their Pennsylvania farm and together they would open a farming operation in North Carolina. The Grays did sell their farm. The Leers entered an agreement (RX 1) dated March 22, 1993, witnessed by Mrs. Shook, to sell their farm to Liberty Associates for $650,000. In June 1993, the Leers moved to North Carolina to join the Grays.

Unfortunately, the business arrangement also "went south." On November 10, 1994, the Grays and the Leers executed an arbitration agreement to settle issues relating to their farming operation. A three member panel of arbitrators entered an award in December 1994 (RX 2) finding that the parties had a partnership which included the Pennsylvania and North Carolina farms. The award identified partnership liabilities to include "all liabilities of the Pennsylvania farm and all the liabilities of the North Carolina farm, whether incurred in the name of the partnership, incurred in the name of the partners on behalf of the partnership, or incurred by any partner on behalf of the partnership." The award directed that the Pennsylvania farm be sold to satisfy the Pennsylvania farm liabilities and net proceeds be contributed to the partnership as a capital contribution on behalf of the Leers. A distribution schedule was also set forth.

Meanwhile, during the summer of 1994, Mrs. Shook learned that the FHA mortgage wasn't being paid and

that foreclosure was being threatened. Both the Grays and the Leers knew that the mortgages were not being paid and foreclosure was threatened. In a letter (PX 4) dated August 15, 1995, FHA advised Mrs. Shook that the Leers owed $217,470.76 in principal and interest on their various farm mortgages. Additional interest was accumulating at $30.61 per day. That correspondence also contained a January 1995, FHA appraisal recommending a fair market value for the farm of $310,000.

On January 28, 1995, the Leers entered an agreement (PX 6) with Mrs. Shook acknowledging their mortgage debt to her of $160,620.72 and agreeing to convey the farm to her, subject to the FHA mortgages, in lieu of mortgage foreclosure. The Leers then conveyed the farm to Mrs. Shook by deed (PX 5) dated January 28, 1995.

It was with this background that the complaint in equity was filed. On April 11, 1995, the Leers filed an answer, new matter and counterclaim to the complaint. Mrs. Shook filed her answer with new matter on April 13, 1995. Then on May 2, 1995, the Grays filed a praecipe with the prothonotary to index a lis pendens against the real estate. On May 30, 1995, Mrs. Shook filed a petition to strike the lis pendens. A hearing on the petition was held before the undersigned on August 21, 1995. A briefing schedule was directed and the matter is now ready for disposition.

We begin our discussion with a general analysis of a lis pendens. A lis pendens literally means a pending suit. *Flitter v. Chandor,* 364 Pa. Super. 252, 255, 527 A.2d 1050, 1051 (1987). As stated in *United States*

*National Bank in Johnstown v. Johnson,* 506 Pa. 622, 487 A.2d 809 (1985),

"A *lis pendens* is the jurisdiction, power or control which courts acquire over property involved in a suit, pending the continuance of the action, *and until its final judgment thereon.* . . . The existence of a *lis pendens* merely notifies third parties that any interest that may be acquired in the *res* pending the litigation will be subject to the result of the action and is not therefore an actual lien on the property." *Id.* at 627, 487 A.2d at 812. (citation omitted) (emphasis in original)

The doctrine has no application except in cases involving the adjudication of rights in specific real estate. *Psaki v. Ferrari,* 377 Pa. Super. 1, 3, 546 A.2d 1127, 1128 (1988), *alloc. denied,* 522 Pa. 578, 559 A.2d 39 (1989).

When courts are called upon to remove or strike a lis pendens equitable principles are applicable. *G.A. Dice v. Bender,* 383 Pa. 94, 97, 117 A.2d 725, 727 (1955). The court must balance the equities to determine whether the application of the doctrine is harsh or arbitrary and whether the cancellation of the lis pendens would result in prejudice to the non-moving party. *Rosen v. Rittenhouse Towers,* 334 Pa. Super. 124, 129-30, 482 A.2d 1113, 1116 (1984). If there is a substantial likelihood that the non-moving party will prevail on the merits, the equities would favor lifting the lis pendens. *Id.* It must be remembered, however, that

"[a]n order lifting a *lis pendens* during the course of an equity action fixes neither rights, duties, nor liabilities between the *parties,* puts no one out of court, and does not terminate the underlying litigation by pro-

hibiting parties from proceeding with the action." *United States National Bank in Johnstown v. Johnson, supra,* at 627, 487 A.2d at 812. (emphasis in original) With this background in mind we now review the various issues raised by the petitioner.

Petitioner points out that plaintiffs rely upon the North Carolina arbitration award as the basis of its complaint in equity and therefore as the basis for indexing the lis pendens. Petitioner contends that the arbitration award, as to the subject real estate, is defective in four respects: (1) it is void for lack of subject matter jurisdiction, (2) it is void for lack of in personam jurisdiction, (3) it is void for vagueness and (4) it is inequitable. We have serious reservations whether petitioner has any standing to raise the issues set forth above. Even if she has standing, however, her attention to jurisdiction is misplaced.

We do not deal in this case with a court's jurisdiction but rather with an arbitration process. North Carolina and Pennsylvania have both adopted the Uniform Arbitration Act, G.S. §1-567.1 et seq. and 42 Pa.C.S. §7301 et seq. respectively. The Act provides that unless a written agreement to arbitrate provides otherwise, an agreement to arbitrate a dispute on a nonjudicial basis shall be presumed to be an agreement for common-law arbitration. 42 Pa.C.S. §7302(a). Here the Leers and the Grays entered an agreement for common-law arbitration to resolve a controversy. They clearly set forth in writing the issues to be resolved which included whether a partnership existed, which assets and liabilities belong to the partnership, what assets should be sold to satisfy liabilities and what timetable should be followed. The agreement provided that the parties would

"abide by and perform any award rendered by the arbitrator(s)" that it was the "exclusive remedy for this dispute" and that the parties would "not later litigate these matters in civil court." (Paragraph 7 of arbitration agreement.)

As a matter of public policy the courts favor settlement of disputes by arbitration. *Elkins & Co. v. Suplee,* 371 Pa. Super. 570, 574, 538 A.2d 883, 885 (1988). Agreements to arbitrate are interpreted in accordance with principles of contract law. Under contract law, the parties' intent is paramount and it is regarded to be embodied within the writing read in its entirety. *Giant Markets Inc. v. Sigma Marketing Systems Inc.,* 313 Pa. Super. 115, 123, 459 A.2d 765, 769 (1983). The Leers and the Grays voluntarily submitted themselves to the discretion of the arbitrators. Once the issue of the assets of the partnership was submitted to the arbitrators, it mattered not where those assets were located. The parties were bound by the award entered and bound to abide by its terms.

Petitioner has cited no case discussing subject matter or in personam jurisdiction where the parties had submitted to common-law arbitration. All cases cited by petitioner deal with a court's jurisdiction to adjudicate issues which, of course, is not the situation sub judice.

In addition, whether the award is vague or inequitable is irrelevant at this point. First, there is no evidence that any party to the arbitration moved to modify the award within 30 days after it was entered. Any challenge to an award made thereafter is too late. *Elkins & Co. v. Suplee, supra;* 42 Pa.C.S. §7342(b). Second, although there is no indication that a judgment or decree was

entered on the award, it appears from the agreement that the award "may be entered as a judgment in a court of competent jurisdiction." (Paragraph 7 of arbitration agreement.) Similar language in *Elkins & Co.* was sufficient to confer jurisdiction upon Pennsylvania courts to enter judgment upon an arbitration award entered in New York. Thus, Grays could make application to enter a decree upon the award at any time. 42 Pa.C.S. §7342(b). Third, anyone taking an appeal from a common-law arbitration must show by clear, precise and indubitable evidence that he was denied a hearing or that there was fraud, misconduct, corruption or some other irregularity of this nature on the part of the arbitrator which caused him to render an unjust, inequitable or unconscionable award. An irregularity refers to the process employed in reaching the result and not to the result itself. *Chervenak, Keane & Company Inc. v. Hotel Rittenhouse Associates Inc.,* 328 Pa. Super. 357, 362, 477 A.2d 482, 485 (1984). In these matters the arbitrator has the authority to decide all matters necessary to dispose of the claim and he is the final judge of both the law and fact. There is no authority to vacate his decision for a mistake of either. *Hassler v. Columbia Gas Transmission Corp.,* 318 Pa. Super. 302, 306, 464 A.2d 1354, 1356 (1983); *Giant Markets Inc. v. Sigma Marketing Systems Inc., supra* at 124, 459 A.2d at 769. Therefore, if the arbitrators made any legal or factual errors, they cannot be reviewed even if raised by Leers. We are aware of no irregularities on the part of the arbitrator.

At this point, we are left with the conclusion that Leers were bound by the terms of the arbitration award. They had no authority to transfer the farm to petitioner.

There is evidence, if believed, which indicates that Leers transferred title to petitioner to intentionally avoid the arbitration award. Petitioner's legal interest was that of a mortgagee and as a first lien holder. Her interest was not in jeopardy if she did not take title to the real estate. Petitioner may certainly have sentimental reasons for wanting to keep the farm in the family. This background, however, does not provide a basis to lift the lis pendens.

We are not suggesting that petitioner did not have a general right under Pennsylvania law to take a deed in lieu of mortgage foreclosure. However, this is an action in equity alleging a fraudulent conveyance in which reconveyance is a distinct possibility. We are likewise not suggesting that petitioner could not have pursued a foreclosure action and eventually obtained title at a sheriff's sale. That procedure, however, would not have involved the active and cooperative efforts of the Leers and might have generated funds at a sheriff's sale which could have been contributed to the partnership. The method employed here completely eliminated that possibility and, on the surface, appears to make a mockery of the arbitration process. Furthermore, at this time, it would involve pure speculation for the court to estimate fair market value and compare the equities of that value to the issues presented.

Accordingly, the attached order is entered.

## ORDER

And now October 26, 1995, the petition to strike lis pendens filed May 30, 1995, is denied.